**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PRIVACY INTERNATIONAL
62 BRITTON STREET
LONDON, EC1M 5UY, UNITED KINGDOM

                          Plaintiffs,

    v.

NATIONAL SECURITY AGENCY,
OFFICE OF THE DIRECTOR OF NATIONAL
INTELLIGENCE,
DEPARTMENT OF STATE, and
NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION

                          Defendants.

Civil Action No. _____

## COMPLAINT

Plaintiff, Privacy International, by its undersigned attorneys, alleges:

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, for declaratory, injunctive, and other appropriate relief brought by Privacy International, a non-profit, non-governmental organization that defends the right to privacy around the world and seeks to ensure that government surveillance complies with the rule of law.

2.      By this action, Privacy International seeks to compel the National Security Agency ("NSA"), the Office of the Director of National Intelligence ("ODNI"), the Department of State ("State"), and the National Archives and Records Administration ("NARA") (collectively, "Defendants") to release requested records relating to the government's agreement to exchange signals intelligence with the governments of the United Kingdom ("U.K."), Canada, Australia and New Zealand (collectively, "Five Eyes alliance").

1

3.      The origins of the Five Eyes alliance stretch back to World War II, but the relationships between the five countries are formalized in the United Kingdom-United States Communication Intelligence Agreement ("UKUSA Agreement"), first signed in 1946 and amended numerous times thereafter. Pursuant to the UKUSA Agreement, the countries agree to the presumption of unrestricted exchange of signals intelligence as well as the methods and techniques related to signals intelligence operations.

4.      A 1955 revision of the UKUSA Agreement is the most recent version of the agreement to be have been made public. Communications methods have dramatically changed since 1955. The development of new technology, especially the internet, has transformed the way individuals communicate with each other and increased the amount of information that can be collected by several orders of magnitude. These advancements vastly increase the opportunities for governments to acquire, store and/or analyze communications and data and to share that information with other governments.

5.      The nature of signals intelligence has also changed dramatically since 1955. As modern communications have evolved, intelligence agencies have developed more advanced ways to access, acquire, store, analyze and disseminate information.

6.      How the government exchanges signals intelligence, and whether it appropriately accommodates the constitutional rights of American citizens and residents as well as the human rights of non-American citizens and residents, are matters of great public significance and concern.

7.      Privacy International seeks access to the current text of the UKUSA Agreement, information about how the government implements the Agreement, and records concerning the standards and procedures for exchanging intelligence under the Agreement. These records are of

paramount concern because the public lacks even basic information about the Five Eyes alliance, including the current text of the Agreement and the rules and regulations that govern the government's access to and acquisition, storage, analysis and dissemination of Americans' communications as part of that arrangement. The public has equally scant information concerning the rules and regulations that govern the government's exchange of signals intelligence it has acquired, stored and/or analyzed with the other members of the Five Eyes alliance. This lack of transparency raises questions about whether the Five Eyes intelligence-sharing arrangement satisfies constitutional and statutory requirements.

8.      Defendants have improperly withheld the requested records in violation of FOIA and in opposition to the public's strong interest in understanding the government's authority and legal basis for exchanging signals intelligence with other governments pursuant to the UKUSA Agreement.

**PARTIES**

9.      Privacy International is a non-profit, non-governmental organization based in London, the U.K., that defends the right to privacy around the world. Privacy International is committed to ensuring that government surveillance complies with the rule of law and the international human rights framework. As part of this commitment, Privacy International seeks to ensure that the public is informed about the conduct of governments in matters that affect the right to privacy. Privacy International is a registered charity in the U.K. and its principal place of business is in London.

10.      Defendant NSA is an intelligence agency established within the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

11.     Defendant ODNI is an intelligence agency established within the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

12.     Defendant State is a department of the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

13.     Defendant NARA is a department of the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this action and personal jurisdiction over Defendants pursuant to 5 U.S.C. § 552(a)(4)(B) and § 522(a)(6)(E)(iii).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06.

15.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

## FACTS

### History of the UKUSA Agreement

16.     During World War II, the U.S. Army and Navy began independently developing signals intelligence relationships with their military counterparts in the U.K., Canada, Australia and New Zealand. In 1946, in the aftermath of the war, the London Signals Intelligence Board ("LSIB") (the predecessor to the Government Communications Headquarters ("GCHQ"), the U.K.'s present-day signals intelligence agency) and the State-Army-Navy Communication Intelligence Board ("STANCIB") (the body then coordinating U.S. signals intelligence activities) ratified the UKUSA Agreement to share signals intelligence.[1] *See* George F. Howe, *The Early*

---

[1] The original UKUSA Agreement was titled the "British-U.S. Communication Intelligence Agreement" and was later re-named the UKUSA Agreement.

*History of NSA*, Cryptologic Spectrum (1974), *available at* https://www.nsa.gov/news-features/declassified-documents/cryptologic-spectrum/assets/files/early_history_nsa.pdf.

17.     The NSA declassified the 1946 Agreement in 2010, along with 41 other documents relating to its formation, implementation, and alteration. All 42 documents are publicly available on the NSA's website. *See* UKUSA Agreement Release 1940-1956, NSA.gov (May 3, 2016), https://www.nsa.gov/news-features/declassified-documents/ukusa/.

18.     As part of the 2010 series of declassifications, the NSA also declassified a 1955 revision of the UKUSA Agreement concluded between LSIB and the U.S. Communications Intelligence Board (which replaced STANCIB). *See* UKUSA Agreement ¶ 11 (Oct. 10, 1956), https://www.nsa.gov/news-features/declassified-documents/ukusa/assets/files/new_ukusa_agree_10may55.pdf (indicating that the Agreement "supersedes all previous Agreements between U.K. and U.S. authorities in the [communications intelligence] COMINT field"). A true and correct copy of the 1955 version of the UKUSA Agreement is annexed hereto as Exhibit A.

19.     Upon information and belief, the 1955 UKUSA Agreement was a binding executive agreement, imbued with the force of law.

20.      An appendix attached to the 1955 UKUSA Agreement reveals that Canada, Australia, and New Zealand officially joined the intelligence sharing alliance as "UK-USA collaborating Commonwealth Countries." *Id.* at ap. J ¶ 2.[2]

21.     The 1955 UKUSA Agreement defines "communication intelligence" ("COMINT") as "all processes involved in, and intelligence information and technical material

---

[2] The appendices attached to the UKUSA Agreement are "considered integral parts" of the Agreement at the time of its amendment." UKUSA Agreement, *supra*, at "Introduction to the Appendices to the UKUSA Agreement."

resulting from, the interception and study of (a) foreign communications passed by wire, radio and other electromagnetic means . . . and (b) of selected foreign communications sent by non-electromagnetic means." *Id.* at ap. A.

22.    It further defines "foreign communications" as "[c]ommunications of the Government, or of any military, air or naval forces, faction, party, department, agency or bureau of a foreign country, or of any person or persons acting or purporting to act therefor, and shall include [REDACTED] communications originated by nationals of a foreign country which may contain information of value." *Id.*

23.    The 1955 UKUSA Agreement provides for the parties to "exchange" the "products" of "operations relating to foreign communications," including the "collection of traffic," "acquisition of communications documents and equipment," "traffic analysis," "cryptanalysis," and "decryption." *Id.* at ¶ 4(a). It further provides for the parties to "exchange . . . information regarding methods and techniques involved in the operations" relating to foreign communications. *Id.* at ¶ 5(a).

24.    For the exchange of foreign communications "products," the 1955 UKUSA Agreement provides that "[s]uch exchange will be unrestricted on all work undertaken except when specifically excluded from the agreement at the request of either party and with the agreement of the other" and that "[i]t is the intention of each party to limit such exceptions to the absolute minimum." *Id.* at ¶ 4(b). For the exchange of "methods and techniques," the Agreement provides that "[s]uch exchange will be unrestricted on all work undertaken except that upon notification of the other party information may be withheld by either party when its special interests so require" and that "[i]t is the intention of each party to limit such exceptions to the absolute minimum." *Id.* at ¶ 5(b). The Agreement also provides, in an appendix articulating

"General Principles of Collaboration on COMINT Production and Collection," that "[t]he objects of these arrangements is to ensure that maximum advantage is obtained from the combined available personnel and facilities of both parties." *Id.* at ap. C ¶ 2. The appendix further states that "[i]n accordance with these arrangements, each party will continue to make available to the other, continuously, currently, and without request, all raw traffic, COMINT end-product and technical material acquired or produced, and all pertinent information concerning its activities, priorities and facilities, both present and planned, subject only to" provisos contained in the Agreement." *Id.* at ap. C ¶ 3. In a separate appendix titled "Communications," the parties indicate their intent to maintain "[e]xclusive and readily extensible telecommunications . . . in order to make possible; (a) the rapid flow of COMINT material from points of interception to the Agencies; (b) the rapid exchange of all types of raw traffic, technical material, end-products, and related material between the agencies; (c) the efficient control of COMINT collection and production." *Id.* at ap. H ¶ 1.

25.     The 1955 UKUSA Agreement indicates that "[a]rrangements involving COMINT collection and production shall be established by agreement between Directors NSA and GCHQ" and that such arrangements "will implement the UKUSA Agreement." *Id.* at ap. C ¶ 1. The arrangements implementing the 1955 UKUSA Agreement have not been publicly disclosed.

**The Evolution of Communications Technology and Surveillance**

26.     Methods of communication have dramatically changed since 1955. The development of new technology, especially the birth of the internet, has transformed the way individuals communicate with each other and increased the amount of information that can be collected by several orders of magnitude.

Case 1:17-cv-01324   Document 1   Filed 07/05/17   Page 8 of 21

27.     Many individuals today live major portions of their lives online. They use the internet to communicate with others, impart ideas, conduct research, explore their sexuality, seek medical advice and treatment, correspond with lawyers, and express their political and personal views. They also increasingly use the internet to conduct many ordinary activities, such as keeping records, arranging travel, and carrying out financial transactions. Today, much of this activity is conducted on mobile digital devices such as cellular phones, which "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley v. California*, 134 S. Ct. 2473, 2489 (2014).

28.     The internet has also enabled the creation of greater quantities of personal data about communications, known as "metadata." Metadata is information about a communication, which may include the sender and recipient, the date and location from where it was sent, and the type of device used to send it. Metadata can reveal web browsing activities, which might reveal medical conditions, religious viewpoints, or political affiliations. It can also reveal items purchased, news sites visited, forums joined, books read, movies watched and games played.

29.     Communications – emails, instant messages, calls, social media posts, web searches, requests to visit a website – that utilize the internet can take any viable route to their destination; distance is not a determinative factor. They have the potential to travel around the world before reaching their destination, even if the information is being sent between two people (or a person and an entity) within a single country, or even a single city. The dispersion of communications across the internet vastly increases the opportunities for communications and data to be intercepted by foreign governments, who may then share them with other governments.

30.     The nature of signals intelligence has also changed dramatically since 1955. As modern communications have evolved, intelligence agencies have developed more advanced ways to access, acquire, store, analyze and disseminate this information. In particular, they have developed methods for acquiring communications and data transiting the internet. The costs of storing this information have decreased drastically and continue to do so every year. At the same time, technology now permits revelatory analyses of types and amounts of data that were previously considered meaningless or incoherent. Metadata, in particular, is structured in such a way that computers can search through it for patterns faster and more effectively than similar searches through the content of communications. Finally, the internet has facilitated remote access to information, meaning communications and data no longer need to be physically transferred from sender to recipient.

**Prior Disclosures Concerning Five Eyes Surveillance**

31.     Over the last few years, information about the nature and scope of the surveillance conducted pursuant to the Five Eyes alliance has been disclosed to the public. The media has revealed, for example, that the NSA, together with its British counterpart GCHQ, acquired the contact lists and address books from hundreds of millions of personal email and instant-messaging accounts as well as webcam images from video chats of millions of Yahoo users. Barton Gellman & Ashkan Soltani, *NSA Collects Millions of E-mail Address Books Globally*, Wash. Post (Oct. 14, 2013), http://wapo.st/2stOyAI.; Spencer Ackerman & James Ball, *Optic Nerve: Millions of Yahoo Webcam Images Intercepted by GCHQ*, The Guardian (Feb. 28, 2014), https://www.theguardian.com/world/2014/feb/27/gchq-nsa-webcam-images-internet-yahoo. It has further revealed that the two agencies have cooperated to tap and extract data from the

private fiber optic cables respectively connecting Yahoo and Google data centers, which are located around the world. Barton Gellman & Ashkan Soltani, *NSA Infiltrates Links to Yahoo, Google Data Centers Worldwide, Snowden Documents Say*, Wash. Post (Oct. 30, 2013), http://wapo.st/1UVKamr.

32.    The media has disclosed that, in addition to joint surveillance operations, the Five Eyes countries also grant each other broad access to the signals intelligence they each gather. For instance, it has revealed that the NSA has access to data flowing through undersea cables that land in the U.K. and intercepted by GCHQ and that GCHQ has access to a database containing the content and metadata of hundreds of millions of text messages collected by the NSA. Ewen MacAskill et al., *GCHQ Taps Fibre-Optic Cables for Secret Access to World's Communications*, The Guardian (June 21, 2013), https://www.theguardian.com/uk/2013/jun/21/gchq-cables-secret-world-communications-nsa; James Ball, *NSA Collects Millions of Text Messages Daily in 'Untargeted' Global Sweep*, The Guardian (Jan. 16, 2014), http://www.theguardian.com/world/2014/jan/16/nsa-collects-millions-text-messages-daily-untargeted-global-sweep. It has further revealed that the Five Eyes countries each have access to a network of servers storing information acquired under various programs operated by their respective intelligence agencies. Glenn Greenwald, *XKeyscore: NSA Tool Collects 'Nearly Everything a User Does on the Internet,'* The Guardian (Jul. 31, 2013), https://www.theguardian.com/world/2013/jul/31/nsa-top-secret-program-online-data; Morgan Marquis-Boire Et. Al., *XKeyscore: NSA's Google for the World's Private Communications*, The Intercept (July 1, 2015), https://theintercept.com/2015/07/01/nsas-google-worlds-private-communications/.

33.     In recent years, the discussion of the government's foreign surveillance powers has focused primarily on the limitations imposed by several statutes, in particular, the Foreign Intelligence Surveillance Act ("FISA"), Section 215 of the Patriot Act (which expired in 2015), and the FISA Amendments Act of 2008. The discussion has also touched upon, to a lesser degree, the government's foreign surveillance powers pursuant to Executive Order 12,333 and the rules that regulate the government's acquisition, storage, analysis and dissemination of the communications of Americans pursuant to that surveillance. Little to no attention has been paid to the Five Eyes alliance and what rules govern the government's access to and acquisition, storage, analysis and dissemination of Americans' communications as part of that arrangement. Equally, little to no attention has been paid to what rules govern the government's exchange of signals intelligence it has acquired, stored and/or analyzed with the other members of the Five Eyes alliance.

**The Current UKUSA Agreement**

34.     The 1955 revision is the most recent version of the UKUSA Agreement to have been made public. Over the past six decades, the NSA has disclosed no further documents relating to the UKUSA Agreement, including any subsequent revisions to the 1955 version of the Agreement.

35.     The 1955 version of the UKUSA Agreement acknowledged that a reappraisal of the 1946 Agreement was necessary, in part, due to "the passage of time which has made out of date much of the detail contained in the Agreement."

36.     Three parties to the 1955 UKUSA Agreement—the U.K., Australia, and New Zealand—have officially acknowledged that some version of the UKUSA Agreement remains in

effect and continues to serve as the framework for intelligence sharing between the five countries. *See* International Partners: How Sharing Knowledge and Expertise with Other Countries Helps Us Keep the UK Safe, GCHQ (Sept. 29, 2016), https://www.gchq.gov.uk/features/ international-partners; UKUSA Allies, Australian Signals Directorate, *available at* https://www.asd.gov.au/partners/ allies.htm; UKUSA Allies, Government Communications Security Bureau (December 6, 2016), https://www.gcsb.govt.nz/about-us/ukusa-allies/.

37.     Upon information and belief, the UKUSA Agreement has been altered, amended, and/or extended many times since 1955.

38.     Upon information and belief, since 1955 Defendants have adopted and/or created regulations, policies, legal opinions, and implementing documents, among other records, that constitute their statements of policy and interpretations of the UKUSA Agreement.

39.     Upon information and belief, since 1955 Defendants have adopted and/or created strategy documents, directives, definitions, and technical manuals, among other records, that concern the implementation of the UKUSA Agreement and that constitute administrative staff manuals and instructions to staff that affect members of the public.

40.     Defendants have failed to disclose publicly these statements of policy, interpretations, staff manuals, or instructions.

41.     Any revisions to the UKUSA Agreement since 1955 also remain secret.

42.     The public has no way of assessing whether the currently operative terms of the UKUSA Agreement contain sufficient constraints against the access to and acquisition, storage, analysis and dissemination of signals intelligence to satisfy domestic or international law.

43.     Disclosing the currently operative provisions in the UKUSA Agreement for protecting privacy and Defendants' interpretations of those provisions is manifestly in the public interest. To the extent that the Agreement currently contains sufficient safeguards to protect privacy, the public will benefit from knowing that their rights remain protected.  Should the Agreement lack such safeguards, the public will be able to demand change from their relevant executive officers.

**The Requested Records**

44.     By letter dated December 13, 2016, Privacy International filed substantially similar FOIA requests with defendants NSA, ODNI, and State, and by letter dated March 16, 2016, Privacy International filed a substantially similar FOIA request with defendant NARA (the "Requests"). Those Requests sought disclosure of:

1. Any records governing, amending, extending or appended to the UKUSA Agreement.

2. Any records relating to the implementation of the UKUSA Agreement by the United States government, including, but not limited to:

a. Regulations, policies, memoranda, legal opinions, strategy documents, directives, definitions, and technical manuals or specifications;

b. Records pertaining to planning, technical and other relevant conferences, including, but not limited to, minutes, reports and recommendations.

3. Any records construing or interpreting the authority of the [agency] pursuant to the UKUSA Agreement; any regulations, policies or other implementing

documents issued thereunder; or any other relevant authorities pertaining to the

UKUSA Agreement.

4. Any records describing the standards that must be satisfied for the "exchange"

of "products" of "operations relating to foreign communications," as the [agency]

defines these terms, pursuant to the [agency]'s authority under the UKUSA

Agreement; any regulations, policies or other implementing documents issued

thereunder; or any other relevant authorities governing the "exchange" of

intelligence "products" under the UKUSA Agreement.

5. Any records describing the minimization procedures used by the [agency] with

regard to the "exchange" of "products" of "operations relating to foreign

communications," as the [agency] defines these terms, pursuant to the [agency]'s

authority under the UKUSA Agreement; any regulations, policies or other

implementing documents issued thereunder; or any other relevant authorities

governing the "exchange" of intelligence "products" under the UKUSA

Agreement.

6. Any other records governing the exchange of intelligence between the United

States government and the governments of the United Kingdom, Canada,

Australia and/or New Zealand.

True and correct copies of the Requests are collectively annexed hereto as Exhibit B, and

incorporated by reference herein.

45.     In its FOIA requests, Privacy International also sought a waiver of search, review,

and duplication fees because the requested records were not sought for commercial use, Privacy

International is a "representative of the news media" under 5 U.S.C. § 552(a)(4)(A)(ii)(II), and

the requested information is in the public interest as defined under 5 U.S.C. § 552(a)(4)(A)(iii).

## Defendants' Treatment of Plaintiff's FOIA Requests

### NSA

46.     By letter dated December 27, 2016, NSA stated that, due to "delays in processing," it had not yet begun processing Privacy International's Request. The NSA further explained that it would not address Privacy International's request for a fee waiver until "further processing is done."

47.     By letter dated February 24, 2017, Privacy International, through counsel, appealed NSA's constructive denial of Privacy International's Request (the "First NSA Appeal").

48.     By letter dated April 24, 2017, John R. Chapman, Chief of the FOIA/PA Office, denied Privacy International's FOIA Request, asserting that all the records responsive to the FOIA Request were exempt from disclosure.

49.     By letter dated May 31, 2017, Privacy International, through counsel, timely appealed the NSA's decision to withhold the requested documents (the "Second NSA Appeal").

50.     By letter dated June 13, 2017, the NSA acknowledged Privacy International's appeal, assigned Plaintiff with an appeal case number, and stated that it would not comply with the appeal within the required statutory timeframe.

51.     As of the filing of this Complaint, Privacy International has received no further information or communication from the NSA concerning the NSA Request or the First or Second NSA Appeals.

52.     As of the filing of this Complaint, it has been 204 days since the Request was submitted, 131 days since the First NSA Appeal was submitted, and 35 days since the Second NSA Appeal was submitted.

## ODNI

53.     By letter dated January 11, 2017, ODNI informed Privacy International that it had initiated a search for the records requested. In that letter, ODNI granted Privacy International's request for a fee waiver.

54.     By letter dated February 24, 2017, Privacy International, through counsel, appealed ODNI's constructive denial of Privacy International's Request.

55.     As of the filing of this Complaint, Privacy International has received no further information or communication from the ODNI concerning the ODNI Request.

56.     As of the filing of this Complaint, it has been 204 days since the Request was submitted, and 131 days since the appeal was submitted.

## STATE

57.     By letter dated December 14, 2016, State notified Privacy International that it was going to begin processing Privacy International's Request, and that the request for a fee waiver had been granted.

58.     By letter dated February 24, 2017, Privacy International, through counsel, appealed State's constructive denial of Privacy International's Request.

59.     By email dated March 8, 2017, Privacy International received a response from Jeanne Miller, Branch Chief at State, acknowledging the Request and the administrative appeal. Ms. Miller notified Privacy International that State was in the process of conducting a search for responsive records but had not located any to date.

60.     By letter dated April 6, 2017, Lori Hartmann, Appeals Officer at State's Office of Information Programs and Services, denied Privacy International's appeal on the basis that the Request had not been denied and was still being processed.

61.     By email dated May 18, 2017, Privacy International received a response from Ms. Miller indicating that the FOIA Request would be "administratively closed" unless Privacy International responded within twenty days.

62.     By email dated May 19, 2017, Privacy International, through counsel, responded, indicating that State should continue to process the Request and search for responsive records.

63.     As of the filing of this Complaint, Privacy International has received no further information or communication from State concerning the State Request.

64.     As of the filing of this Complaint, it has been 204 days since the Request was submitted and 90 days since the appeal was denied.

## NARA

65.     By email dated March 16, 2017, NARA sent Privacy International an automated response confirming its receipt of Privacy International's Request and explaining that it had forwarded the Request to the "Office of Research Services, Special Access and FOIA" division. NARA additionally stated that Privacy International would be assigned a new tracking number.

66.     As of the filing of this Complaint, Privacy International has not received a tracking number for its Request.

67.     As of the filing of this Complaint, Privacy International has received no further information or communication from NARA concerning the NARA Request.

68.     As of the filing of this Complaint, it has been 111 days since the Request was submitted.

69.     None of the four Defendant agencies has produced any records responsive to Privacy International's Requests.


## CAUSES OF ACTION

### Count I

### Violation of FOIA for wrongful withholding of agency records

70.     Plaintiff repeats, re-alleges, and incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

71.     Defendants are agencies subject to FOIA. 5 U.S.C. § 556(f); 5 U.S.C. § 551. The FOIA Requests properly seek records within the possession, custody, and/or control of Defendants.

72.     Defendants' failure to make available the records requested by Plaintiff in a timely manner violates FOIA. 5 U.S.C. § 552(a)(3)(A).

73.     Plaintiffs have or are deemed to have exhausted applicable administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i).

### Count II

### Violation of FOIA by NSA and NARA for failure to grant fee waiver

74.     Plaintiff repeats, re-alleges, and incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

75.     Defendants NSA and NARA's failure to grant Plaintiff's request for a public interest fee waiver violates FOIA. 5 U.S.C. § 552(a)(4)(A)(iii).

**Count III**

**Violation of FOIA for failure to make records available under "Reading Room" provision**

76.     Plaintiff repeats, re-alleges, and incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

77.     Defendants have failed to make available for public inspection in an electronic format their statements of policy and interpretations concerning the UKUSA Agreement, which they have adopted and not published in the Federal Register, and all administrative staff manuals and instructions to staff concerning the UKUSA Agreement that affect a member of the public.

78.     Defendants' failure to make available for public inspection in an electronic format their statements of policy and interpretations of the UKUSA Agreement, staff manuals and instructions violates FOIA, 5 U.S.C. § 552(a)(2).

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff respectfully requests this Court to:

a.      Declare that Defendants have failed to comply with the disclosure obligations of 5 U.S.C. 552(a)(3);

b.      Order Defendants to conduct a thorough search for all records responsive to Plaintiff's Requests and to immediately disclose, in their entirety, all responsive records that are not specifically exempt from disclosure under FOIA;

c.      Declare that Defendants have failed to comply with the disclosure obligations of 5 U.S.C. 552(a)(2);

d.      Order Defendants to make available for public inspection in an electronic format those responsive documents that constitute statements of policy

and interpretations of the UKUSA Agreement, which have been adopted by the agency and are not published in the Federal Register;

e.    Order Defendants to make available for public inspection in an electronic format those responsive documents that constitute staff manuals and instructions concerning the UKUSA Agreement that affect a member of the public;

f.    Declare that Plaintiff is entitled to a public interest fee waiver;

g.    Award Plaintiff the costs of this proceeding, including reasonable attorneys' fees and costs; and

h.    Grant such other and further relief as the Court deems just and proper.

Dated:  July 5, 2017

Respectfully submitted,

YALE LAW SCHOOL MEDIA FREEDOM AND INFORMATION ACCESS CLINIC

By: */s/ Hannah Bloch-Wehba*
Hannah Bloch-Wehba (Bar ID 1031703)
Media Freedom and Information Access Clinic
Yale Law School
P.O. Box 208215
New Haven, CT 06520-8215
Tel: (203) 436-5824
Fax: (203) 432-3034
hannah.bloch-wehba@yale.edu

David A. Schulz (Bar ID 459197)
321 West 44th Street, Suite 1000
New York, NY 10036
Tel: (212) 850-6100
Fax: (212) 850-6299
dschulz@lskslaw.com

*Counsel for Plaintiff*

*Of Counsel*:
Scarlet Kim
Caroline Wilson Palow
Privacy International
62 Britton Street
London, EC1M 5UY
United Kingdom
Tel: +44 (0) 20 3422 4321
scarlet@privacyinternational.org
caroline@privacyinternational.org